IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| KENNETH CHERRY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff United Parcel Service, Inc. ("UPS"), by and through its undersigned attorneys, brings this Complaint for Injunctive Relief and Damages against Defendant Kenneth Cherry ("Mr. Cherry"), and respectfully shows as follows:

## INTRODUCTION

This lawsuit arises out of a former senior executive's violation of a reasonable noncompete that protects UPS's legitimate business interests. Mr. Cherry worked for UPS for almost four decades, eventually becoming one of the top 150 employees at UPS, an organization of more than 500,000 employees.

Mr. Cherry's most recent senior role was as UPS's President of US Operations, Training, Health & Safety. In this role, he reported directly to UPS's Executive Vice President and President U.S., a member of UPS's Executive

1

Leadership Team.  He participated in highly confidential senior leadership meetings with other executives who led each of the major functions at UPS, including the business leaders of UPS's domestic operations covering the areas of Finance, Sales, Industrial Engineering, and Marketing, as well as with leaders of UPS's East and West Regions and its Transportation Group.

Due to his senior management role within UPS, Mr. Cherry was eligible for and accepted vesting stock compensation under an LTIP Agreement (defined below). In exchange for an award under this program, he agreed to several restrictive covenants, including a noncompete, a nondisclosure covenant, a customer nonsolicitation covenant, and an employee nonrecruitment covenant. The noncompete is reasonably tailored in time, scope, and geographic limitation.  It specifically identifies Amazon as a Restricted Competitor, and both Amazon and UPS's public filings make clear that they are competitors.

Mr. Cherry recently "retired" from UPS and began drawing his UPS pension and retirement benefits, which includes a substantial monthly benefit. After "retiring", he immediately joined Amazon, a competitor of UPS which has a recent history of poaching senior-level, high-value UPS talent in violation of their post-employment restrictions to UPS. Mr. Cherry is in a senior operational position with Amazon as a Vice President where he is or will be performing many of the same or

similar services for Amazon that he once performed for UPS and where his intimate knowledge of UPS's operations will allow Amazon to better compete with UPS. Mr. Cherry's conduct directly violates the straightforward terms of his one-year noncompete. This is the third very senior, highly compensated executive that Amazon has poached from UPS in violation of the executive's post-employment restrictions in the last 12 months.

UPS will be irreparably harmed if Mr. Cherry is permitted to continue violating his noncompete. Mr. Cherry agreed with UPS that his breach of the LTIP Agreement would cause such harm. In sum, Mr. Cherry, a sophisticated senior executive, agreed to reasonable limitations on his employment when he accepted a substantial award of restricted performance units of UPS stock. After retiring from UPS, he promptly breached those promises. UPS brings this action to obtain injunctive relief to stop Mr. Cherry's ongoing breaches, to recover damages for Mr. Cherry's breaches to date, and for all other relief provided for in the LTIP Agreement.

## PARTIES, JURISDICTION AND VENUE

### 1.

UPS is a Delaware corporation with its principal place of business in Atlanta, Georgia.

2.

Mr. Cherry is an individual who resides in and is a citizen of the State of California.

3.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332. UPS is of diverse citizenship from Mr. Cherry.  Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs, as UPS is likely to suffer millions of dollars in damages if Mr. Cherry is allowed to continue unlawfully competing.

4.

Jurisdiction and venue are proper in this Court because, in the LTIP Agreement, Mr. Cherry agreed that the federal or state courts of Georgia would have exclusive jurisdiction of any dispute relating to the restrictive covenants therein, and Mr. Cherry consented to jurisdiction in such courts.

## STATEMENT OF FACTS

### UPS's Global Package Delivery System

5.

UPS is the world's largest package delivery company. On a daily basis, UPS

delivers packages to nearly 12 million customers in over 220 countries and territories. UPS offers transportation, distribution, contract logistics, and other services across North America, Europe, the Indian sub-continent, the Middle East, Africa, Asia Pacific, and Latin America.

6.

While its reach is global, UPS is headquartered in Georgia, and UPS employs thousands of Georgia residents across the State to manage and facilitate the major aspects of UPS's business.

7.

UPS dedicates substantial time and resources to refining and improving its business operations. Major characteristics of UPS's business include its global pickup and delivery system and the variety of services UPS offers, including both individual package delivery and large-scale supply chain logistics.

8.

UPS maintains and operates a globally-integrated logistics network, through which UPS operates all of its package-delivery services, whether air, ground, domestic, international, commercial, or residential. UPS further offers its customers a unique range of services, particularly supply chain services aimed at businesses,

such as freight forwarding, truckload brokerage, customs brokerage, order fulfillment, and returns management.

9.

UPS's global operations rely on health and safety strategies and procedures to ensure the wellness of its 500,000 employees, as well as the safety of its customers and the public.  UPS requires strict health and safety regulatory compliance at all local, national, and international levels.

10.

UPS's focus on delivery driver and employee safety is a key competitive differentiator that it has achieved only through substantial investment in proprietary tools and techniques, with the know-how developed over the course of many years. For example, development of UPS's Integrad training centers for drivers required significant expenditures on consultants, vendors, and equipment to develop best in class protocols. Those proprietary techniques and methods, which Mr. Cherry knows, are a valuable competitive asset that UPS is entitled to protect.

**UPS's Efforts To Protect Its Competitive Technologies And Talent**

11.

UPS utilizes an array of strategies to protect its valuable and sensitive information, as well as its key relationships.  For one, recognizing the value of its professional talent, UPS strongly prioritizes the support and retention of its employees. To this end, UPS expends immense resources to create a desirable, lucrative, and inclusive work environment for all of its personnel.

12.

UPS strives to create an "employee-owner" culture, including by awarding its employees stock in the company, an idea first employed by UPS's founders; UPS has awarded its employees stock in the company for nearly 100 years.

13.

UPS cultivates a profitable and empowering working environment for its employees, and uses that as a mechanism to retain top talent, particularly those who could take confidential information, trade secrets, or other proprietary information to a competitor.

**UPS's Long-Term Incentive Performance Program**

14.

For its high-level management, UPS offers a Long-Term Incentive Performance Program (the "LTIP Program"), which provides a type of stock compensation that vests over time. This compensation is intended to incentivize the most highly trained and deeply skilled employees—those most likely to have access to confidential information and key relationships—to remain at UPS for the long term, rather than taking their skills and knowledge to a competitor.

15.

The LTIP Program is aimed at retaining the roughly 500 most senior UPS personnel from UPS's more than 500,000 total personnel, *i.e.* the top 0.1% of the company's employees. UPS's personnel system groups its employees by organizational level; the employees who qualify for the LTIP Program are those employees designated as the "Band 50" level and above. Above the "Band 50" level are the "Band 60" and "Band 70" levels, and then the C-Suite Executive Leadership Team.

16.

To participate in the LTIP Program, qualifying UPS managers agree to a set of terms and conditions, including a set of restrictive covenants. The terms at issue

with respect to Mr. Cherry are set forth in the March 25, 2021 Amended and Restated Terms and Conditions of the UPS Long-Term Incentive Performance Program (the "LTIP Agreement").[1]

## Mr. Cherry's Employment History at UPS

### 17.

Mr. Cherry worked at UPS for 38 years and served in various senior-level leadership positions for UPS.  At the time of his retirement, he was one of the senior-most 150 employees at UPS, an organization of more than 500,000 employees.

### 18.

At the time of his departure, he was the senior leader of Health and Safety for UPS's United States small package division, which constitutes almost 80% of UPS's business.

### 19.

In that position, he reported directly to UPS's Executive Vice President and President U.S., a member of UPS's Executive Leadership Team.

### 20.

Mr. Cherry participated in highly confidential senior leadership meetings with other executives who led each of the major functions at UPS, including the business

---

[1] A redacted version of the LTIP Agreement is attached as Exhibit A.

leaders of UPS's domestic operations covering the areas of Finance, Sales, Industrial Engineering, and Marketing, as well as with leaders of UPS's East and West Regions and its Transportation Group.

21.

Mr. Cherry managed a substantial number of employees, whom he had the ability to hire and fire.

22.

Prior to that position, he served as the most senior leader of the Desert Mountain District, a U.S. region that covers Arizona, Utah, Colorado and New Mexico, does approximately $2 billion in annual revenue, and has over 20,000 employees.

23.

In this role, Mr. Cherry had a vast set of responsibilities related to UPS's package delivery services and strategic planning within his region, including overall P&L responsibility for the region, as well as responsibility for productivity, efficiency, safety, and talent development.

24.

In his own words, Mr. Cherry was responsible for "all strategic planning and execution of the strategic plans with an emphasis on performance and growth".

10

25.

Immediately prior to his role for the Desert Mountain District, Mr. Cherry performed a similar role for the South California District, comprising Southern California, Nevada and Hawaii.

26.

During his tenure as a District Manager of the Southern California and then the Desert Mountain Districts, a few of Mr. Cherry's core duties included using "marketing insights and knowledge of markets to accurately forecast growth and profit opportunities", acting as a UPS ambassador in local communities and in interacting with local businesses, and understanding and implementing corporate and region-specific initiatives.

27.

Additionally, he was responsible for the creation and implementation of district business plans through collaboration with functional managers and based on confidential competitive information developed and shared by UPS related to corporate goals, function and subsidiary capabilities, markets and the global business climate.

28.

Another core competency of the roles was the development of future generations of UPS leaders and ultimately making strategic decisions about lateral movement and promotion of UPS employees to key positions.

29.

Prior to serving in the District Manager roles, Mr. Cherry served as President of the UPS Supply Chain Solutions Division, and before that as Vice President of Customer Information Management and in other key roles within the UPS organization. Mr. Cherry's cross-functional and geographical experience made him a key team member at UPS.

30.

Mr. Cherry was highly compensated in these roles, and he developed substantial expertise through the training and investment UPS made in him.

31.

He had regular exposure to UPS's confidential information and oftentimes was part of the strategic team that was strategizing, creating and implementing confidential and proprietary operational decisions related to the U.S. Small Package Business as a whole and most recently related specifically to the Health, Safety and Training initiatives.

32.

He received intimate knowledge of UPS's innovative health and safety policies, strategies, training policies, and technology – all of which reduce injuries and risk, promote the health and safety of UPS employees, and maintain health and safety regulatory compliance.

33.

He was exposed to, understood and implemented the proprietary methods and approaches to training at UPS.

34.

In his most recent senior leadership role, Mr. Cherry regularly received and was privy to various highly sensitive confidential information regarding all aspects of UPS's domestic operations, including regarding the company's customer and vendor relationships, business initiatives, training methods, profitability, productivity, and organizational talent.

35.

Mr. Cherry understands the trends UPS sees in the market and its approach based on that competitive intelligence, and he understands where UPS is the most profitable, and why, within the U.S. market.

36.

Mr. Cherry understands how UPS uses this information to leverage productivity in a competitive package delivery landscape, including the key vendor relationships that are part of UPS's success.

37.

All of this information would be highly valuable to a competitor like Amazon, and UPS has a substantial interest in safeguarding this information and knowledge from misuse.

38.

When Mr. Cherry was promoted to senior leadership positions, first as the Vice President of Customer Information Management and then again when promoted to the role of the senior leader of the Desert Mountain District, he was asked to sign, and did sign, employment agreements containing restrictive covenants, including post-employment noncompetition restrictions.

39.

Mr. Cherry is thus well aware that UPS asks its executive-level employees to agree to reasonable restrictive covenants designed to protect UPS's legitimate business interests.

14

**The LTIP Agreement's Restrictive Covenants**

40.

Mr. Cherry's last position with UPS was as its President of U.S. Operations, Training, Health & Safety. In this role, he was a Band 60 UPS employee, reflecting that he held a senior management role within the company, and he was eligible to participate in the LTIP Program.

41.

Under the LTIP Agreement, Mr. Cherry received a total LTIP award of 1,883 restricted performance units of UPS stock equivalent to 100% of his annualized salary.  These benefits started to vest on June 1, 2021.

42.

The LTIP Agreement contains a Covenant Not To Compete, set forth in Section 7.6, by which the participating UPS employees agree that ***"[d]uring the Non-Compete Restricted Period***, you will not, without the ***prior written consent of [UPS]***, (a) ***work for a Restricted Competitor***; (b) provide consulting services to a Restricted Competitor; or (c) otherwise provide services to a Restricted Competitor, in each of (a) through (c) that involves the provision of ***services that are similar to those services that you provided to [UPS]*** and that ***relate to the Restricted Competitor's competition with the transportation, delivery or logistics services***

*provided by [UPS] during your employment*."  LTIP Agreement § 7.6 (emphasis added).   As the LTIP Agreement states, this provision is "*limited to the geographic area where [UPS] did business* during" the relevant employee's employment.  *Id.* (emphasis added).

43.

The "Non-Compete Restricted Period" is defined as "during your employment with [UPS] and for a period of *one (1) year* after your employment ends for any reason." LTIP Agreement § 7.12.3 (emphasis added).

44.

The noncompete is limited to future employment with competitors. The LTIP Agreement defines "Restricted Competitor" to mean any business that competes with UPS's "businesses of package delivery and global supply chain management solutions," including any affiliates of such businesses "that are engaged in delivery, transportation and/or logistics services and activities." LTIP Agreement § 7.12.7.

45.

The agreement provides a list of Restricted Competitors, attached to the LTIP Agreement as Exhibit B, and expressly includes Amazon, among other entities. LTIP Agreement § 7.12.7, Exhibit B.

16

46.

Moreover, Amazon and UPS acknowledge they are competitors in their respective 2022 10-K filings: Amazon states that its competitors include "companies that provide fulfillment and logistics services for themselves or for third parties, whether online or offline." Amazon's February 4, 2022 10-K Report, p. 4.  UPS similarly states that "e-commerce companies that are making significant investments in their capabilities" are part of the "significant competition" that UPS faces within the industry. UPS's February 22, 2022 10-K Report, p. 10.

47.

The LTIP Agreement also contains a standard nondisclosure provision. Specifically, in Section 7.3 of the LTIP Agreement, Mr. Cherry agreed that he would not directly or indirectly reveal, divulge, or disclose any Confidential Information or Trade Secrets of UPS to any person not expressly authorized by UPS to receive such information.

48.

The LTIP Agreement defines "Confidential Information" as all information regarding UPS, its activities, business or customers which Mr. Cherry learned as a result of his employment, that is valuable to UPS, and that is not generally disclosed

by practice or authority to persons not employed or otherwise engaged by UPS, whether or not it constitutes a Trade Secret.  LTIP Agreement § 7.12.2.

49.

"Trade Secrets" are defined as all of UPS's information that Mr. Cherry learned about as a result of his employment, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a drawing, a process, financial data, financial plans, distribution lists or a list of actual or potential customers, advertisers, or suppliers, that derives economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

50.

Mr. Cherry further agreed that he would not directly or indirectly use or make use of any Confidential Information or Trade Secrets of UPS in connection with any business activity other than business activity he was pursuing on behalf of UPS.

51.

Mr. Cherry agreed to the terms set forth in the LTIP Agreement, including the

restrictive covenants set forth therein.  By signing the LTIP Agreement, he "expressly accept[ed] the terms and conditions," and agreed that he had "accept[ed] this Agreement voluntarily, that [he had] read this Agreement carefully, that [he had] a full and reasonable opportunity to consider this Agreement (including actual consultation with legal counsel), and that [he had] not been pressured or in any way coerced, threatened or intimidated into entering into this Agreement." LTIP Agreement §§ 5, 7.2.

52.

Mr. Cherry also agreed that "as a result of [his] receipt of Confidential Information, [his] role at the Company, and [his] relationships with Company customers and/or employees[,] [he] would have an unfair competitive advantage if [he] were to violate" the noncompete restriction.  LTIP Agreement § 7.2. He further agreed that "in the event that [his] employment with the Company terminates for any reason, [he] possess[es] marketable skills and abilities that will enable [him] to find suitable employment without violating" the noncompete restriction.  *Id.*

53.

Mr. Cherry agreed to the remedies that UPS could exercise in the event of his breaching the noncompete restriction. The LTIP Agreement states that:

> [i]n the event that you breach, or threaten to breach [the noncompete] you agree that [UPS] shall have the right and remedy to:  (a) enjoin you,

19

preliminarily and permanently (without the necessity of posting bond), from violating or threatening to violate [the noncompete] because any breach or threatened breach of [the noncompete] would cause irreparable injury to [UPS] and that money damages would not provide an adequate remedy; (b) require you to account for and pay over to [UPS] all compensation, profits, monies, or other benefits derived or received by you as the result of any breach of [the noncompete restriction]; and (c) require you to pay the reasonable attorneys' fees and costs incurred by [UPS] in enforcing [the noncompete restriction].

LTIP Agreement § 7.7.

54.

Moreover, Mr. Cherry expressly agreed that if he were to breach the noncompete, he would "automatically forfeit all" compensation awarded as part of the LTIP Program. *Id.*

## Mr. Cherry's Departure From UPS And Breach Of The LTIP Agreement

55.

UPS provided the LTIP Agreement to all qualifying employees on March 25, 2021.

56.

Mr. Cherry accessed his online UPS Merrill Lynch portal and clicked to accept the terms of the LTIP Agreement on March 28, 2021.

57.

Mr. Cherry never voiced any concern or complaint about the LTIP Agreement, or the restrictive covenants contained therein.

58.

Shortly after Mr. Cherry accepted the LTIP, two high level executives who had also accepted the LTIP left UPS and joined Amazon in violation of their post-employment restrictions.

59.

The role Mr. Cherry moved into as UPS's President of U.S. Operations, Training, Health & Safety, resulted from one of those departures and a restructuring of the positions surrounding the health and safety function.

60.

Mr. Cherry was thus well aware of UPS's concerns regarding Amazon's hiring of UPS executives in violation of the obligations in the LTIP Agreement.

61.

A year later, Mr. Cherry announced his retirement from UPS, and he left UPS on June 3, 2022.

62.

He started drawing UPS pension and retirement benefits on July 1, 2022 and is receiving a substantial monthly benefit.

63.

Upon information and belief, Mr. Cherry commenced employment with Amazon within a few weeks of his retirement. As set forth above, Amazon is specifically named as one of the Restricted Competitors in the LTIP Agreement.

64.

Mr. Cherry was hired by Amazon in a senior operational position as a Vice President.

65.

According to Amazon, Mr. Cherry was hired in a supply chain role in Amazon's "Devices" organization.

66.

Mr. Cherry's role admittedly involves logistics as he is or will be overseeing transportation of consumer electronic parts and products from manufacturers to Amazon's fulfillment centers.

67.

He is also involved in the strategic planning and coordination of the supply of consumer electronic parts and products to Amazon.

68.

Mr. Cherry thus is or will be performing many of the same or similar services for Amazon that he once performed for UPS, and his intimate knowledge of UPS's operations will be highly valuable and useful to Amazon and will allow it to better compete with UPS by delivering products to market in a timelier, more cost-effective, and safer manner.

69.

Mr. Cherry is thus in direct breach of the noncompete in Section 7.6 of the LTIP Agreement.

70.

Upon information and belief, Mr. Cherry is violating or will violate the nondisclosure covenant in Section 7.3 of the LTIP Agreement through his employment with Amazon.

**Harm To UPS From Mr. Cherry's Breach Of The LTIP Agreement**

71.

UPS entered into the restrictive covenants in the LTIP Agreement with Mr. Cherry to protect its legitimate business interests. UPS has a substantial interest in protecting and safeguarding Mr. Cherry's knowledge of various confidential information regarding UPS's business that Mr. Cherry was exposed and privy to and instrumental in creating and developing, as set forth above.

72.

UPS sought to obtain reasonable protection of those interests by entering into the LTIP Agreement with Mr. Cherry.

73.

The failure to protect this information and these relationships would result in irreparable harm to UPS.

74.

As described above, Mr. Cherry agreed that if he were to breach the LTIP Agreement's restrictive covenant, such conduct would cause UPS "irreparable injury" for which "money damages would not provide an adequate remedy." LTIP Agreement § 7.7.

75.

Mr. Cherry agreed that "[UPS] shall have the right and remedy to . . . enjoin [him], preliminarily and permanently (without the necessity of posting bond), from violating or threatening to violate [the restrictive covenant]", and that it would be difficult or impossible to quantify the harm to UPS caused by Mr. Cherry.

76.

Accordingly, the only sufficient protection is an injunction against the breach that requires Mr. Cherry to comply with the terms of the LTIP Agreement's noncompete, as well as the nondisclosure provision.

**The Public Interest**

77.

Enforcing the restrictive covenant to which Mr. Cherry agreed would serve the public interest as expressed by the Georgia Assembly, which has affirmed the value of such covenants in "protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50.

78.

Georgia's public interest is served by enforcing a valid agreement entered into by a Georgia-headquartered company and a sophisticated senior employee who was living in Georgia when he signed the agreement and worked for UPS.

79.

Mr. Cherry will not suffer any undue burden from the enforcement of this agreement. Compliance with the LTIP Agreement does not preclude him from working altogether.  Indeed, he agreed in the LTIP Agreement that he would be able to obtain suitable employment that would not breach his noncompete restriction. Further, as he has retired from UPS, he has begun drawing a sizable pension from UPS and therefore would not be denied an income if he elected to stop working altogether.

80.

The Georgia public and UPS both have a clear interest in the enforcement of the LTIP Agreement's restrictive covenants, which are reasonable and well within the limits allowed by the Georgia Restrictive Covenant Act that would have allowed for a two-year post-employment restriction on competition. These interests are not outweighed by any interest that Mr. Cherry has in breaching a plainly enforceable agreement to which he agreed.

81.

In sum, all equitable factors weigh in favor of issuing injunctive relief to enforce Mr. Cherry's noncompete.

82.

UPS respectfully requests that this Court enter injunctive relief during the pendency of this litigation and, ultimately, enter a permanent injunction against Mr. Cherry's ongoing breach of his commitment not to take his valuable knowledge and skills to UPS's direct competitor.

83.

UPS also respectfully requests that this Court award the costs, fees, and damages as specified in the LTIP Agreement.

## COUNT I

### Breach of Contract

84.

UPS incorporates and re-alleges the foregoing paragraphs by reference as though fully set forth herein.

85.

The LTIP Agreement is a valid, binding, and enforceable agreement.

86.

UPS performed all conditions, duties, obligations and promises required to be performed by UPS under the LTIP Agreement.

87.

The LTIP Agreement contains an enforceable noncompete that is reasonably limited in time, geographic area, and scope of prohibited activities. The LTIP Agreement also provides a list of restricted competitors as permitted by Georgia law.

88.

Mr. Cherry is in breach of the LTIP Agreement through his employment with Amazon, which expressly included on the list of restricted competitors.

89.

UPS has legitimate business interests in entering into and enforcing the noncompete restriction with Mr. Cherry, as articulated above.

90.

Upon information and belief, Mr. Cherry has also breached, is breaching, or will breach the nondisclosure covenant in the LTIP Agreement.

91.

Mr. Cherry's breaches of the LTIP Agreement have caused, and absent an injunction will continue to cause, irreparable harm that cannot be redressed by

money damages.  As stipulated in Section 7.7 of the LTIP Agreement, Mr. Cherry

agreed that such a breach would cause irreparable harm.  There is no adequate

remedy at law that can redress this breach.

92.

Pursuant to Section 7.7 of the LTIP Agreement and O.C.G.A. section 13-8-

58(c), the Court should issue injunctive relief enjoining and restraining Mr. Cherry

from violating his noncompete and nondisclosure obligations.

93.

Pursuant to Section 7.7 of the LTIP Agreement, Mr. Cherry is contractually

obligated to disgorge all compensation, profits, monies, or other benefits derived or

received by him as a result of his breaches, which, upon information and belief, are

worth hundreds of thousands of dollars.

94.

Pursuant to Section 7.7 of the LTIP Agreement, Mr. Cherry is contractually

obligated to pay UPS's reasonable attorneys' fees and costs incurred in enforcing

his obligations.

95.

UPS is also entitled to an award of its attorneys' fees and the costs of this

litigation pursuant to O.C.G.A. section 13-6-11 because Mr. Cherry has acted in bad

faith, has been stubbornly litigious, and has caused UPS unnecessary trouble and expense.

96.

Pursuant to Section 7.7, as a result of his violations of the LTIP Agreement, Mr. Cherry has contractually forfeited the units awarded to him. Based on the amount of units vested from his 2021 LTIP award at the time of Mr. Cherry's retirement, the forfeiture of his 2021 LTIP award equates to approximately $100,000 in forfeited stock.

## PRAYER FOR RELIEF

WHEREFORE, UPS respectfully prays of this Honorable Court as follows:

A.     For injunctive relief restraining and enjoining Mr. Cherry, and those persons in active concert or participation with him, from violating the LTIP Agreement;

B.     For a judgment against Mr. Cherry in an amount to be determined and proven at the time of trial;

C.     For an award of UPS's reasonable attorneys' fees and the expenses of litigation incurred in pursuing this Complaint; and

D.     For such other and further relief as this Court deems just, proper and equitable under the circumstances.

This 20th day of July, 2022.

Respectfully submitted,

BERMAN FINK VAN HORN P.C.

By:    */s/ Benjamin I. Fink*
      Benjamin I. Fink
      Georgia Bar No. 261090
      Lea C. Dearing
      Georgia Bar No. 922882
      Neal F. Weinrich
      Georgia Bar No. 294586
      3475 Piedmont Road, N.E., Suite 1640
      Atlanta, Georgia 30305
      (404) 261-7711
      bfink@bfvlaw.com
      ldearing@bfvlaw.com
      nweinrich@bfvlaw.com

      *Counsel for Plaintiff*
      *United Parcel Service, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rules 7.1D and 5.1B, the undersigned counsel certifies that this document complies with the Local Rules' requirements as to font in that it has been prepared in Times New Roman, 14 point.

Dated: July 20, 2022

BERMAN FINK VAN HORN P.C.


By:  */s/ Benjamin I. Fink*
       Benjamin I. Fink
       Georgia Bar No. 261090
       Email: bfink@bfvlaw.com

3475 Piedmont Road NE
Suite 1640
Atlanta, Georgia 30305
(404) 261-7711
(404) 233-1943 (Facsimile)

COUNSEL FOR PLAINTIFF
UNITED PARCEL SERVICE,
INC.